498 P.2d 153

Bartolo MARTINEZ, Jr., Petitioner,

v.

The INDUSTRIAL COMMISSION of Arizona, Respondent,

Kitchell Contractors, Inc., Respondent Employer,

State Compensation Fund, Respondent Carrier.

No. 1 CA–IC 661.

Court of Appeals of Arizona, Division 1, Department A.

June 13, 1972.

Rehearing Denied July 6, 1972.

Review Denied Sept. 12, 1972.

Spencer K. Johnston, Pheonix, for petitioner.

William C. Wahl, Jr., Chief Counsel The Industrial Commission of Arizona, Phoenix, for respondent Commission.

Robert K. Park, Chief Counsel State Compensation Fund, by Arthur B. Parsons, Phoenix, for respondent Carrier.

STEVENS, Presiding Judge.

The question before the Court is whether the petitioner's psychiatric problems bear a causal relationship to his industrial accident.

Bartolo Martinez, Jr., herein referred to as the petitioner, at the age of 24 years sustained an industrially related injury to his back and leg on 23 January 1968 when he was carrying a long board used as a part of a runway over which Georgia buggies full of wet cement were guided. He missed his step and became partially immersed in wet concrete. He was initially treated on 24 January 1968 by F. S. Kon, D.O., who estimated that the petitioner's disability would have a duration of approximately two weeks. Apparently the petitioner returned to gainful employment for various periods of time which are not clear from the record.

He was examined by Leo L. Tuveson, M.D., an orthopedic surgeon, on 23 April 1968. Dr. Tuveson found an absence of objective signs of any residuals and expressed the opinion that there was no disability resulting from the injury of 23 January. On 28 May 1968 Dr. Kon reported that the plaintiff had returned to light work on 27 May 1968 and that he agreed with Dr. Tuveson's report, but that the petitioner was still complaining of pain.

The file contains an award of 2 August 1968 allowing total temporary disability from 26 March 1968 through 26 May 1968 with a finding of no physical or mental disability resulting from the accident in question. The award contained a 20-day

clause and there was no request for a hearing.

There was a 3 September 1968 petition to reopen supported by a report by Sidney L. Stovall, M.D., an orthopedic surgeon, which report stated in part:

"Mr. Martinez seems to be sincere in his complaints but there is nothing on physical findings or x-rays that would substantiate his complaints."

On 14 October 1968 the petition to reopen was denied.

▮ There followed a 29 November 1968 petition to reopen. It is this petition which lays the groundwork for the balance of the file and as a consequence this matter is governed by the law as it existed before January 1, 1969, the main feature being that the officer conducting the hearings acted as a referee, with the actual decision resting with The Industrial Commission of Arizona. In support of his petition to reopen, the petitioner submitted a report by Stanford F. Hartman, M.D., an orthopedic surgeon. We quote from Dr. Hartman's report:

"COMMENT: This patient should see a psychiatrist. He has an overlay that should be checked.

"DIAGNOSIS: Psychosis."

The petition to reopen was denied, followed by a request for a hearing. Shortly before the date scheduled for the hearing the petitioner secured the services of his present counsel, this being his first employment of counsel.

The hearing was held on 11 February 1970 and the petitioner testified as to his efforts to do heavy work, together with his inability to carry on for an extended period of time. The petitioner testified with pride that he had been the number three concrete man in his union before the accident.

The petitioner testified that due to the pain he experienced after the accident he was unsuccessful in his efforts to cut lettuce. This was corroborated by a fellow worker.

The medical evidence at the hearing can be summarized. The doctors found no objective evidence of residual physical disability relating to the injury of January. They recognized the possibility of soft tissue injury, a condition difficult to diagnose. Dr. Stovall repeated the substance of the above-quoted portion of his report.

After the close of the evidence and on suggestion of the referee, petitioner was examined, this time by Joel D. Fisler, M.D., also an orthopedic surgeon. His report concludes as follows:

"IMPRESSION: I am unable to find any objective evidence of problems to substantiate this patient's complaints. The patient seems to be sincere in his complaints and with a total lack of objective findings it seems possible that this patient is totally convinced of his disability. A psychiatric evaluation may be of assistance in helping this patient understand his problems."

Dr. Fisler later testified and his testimony was consistent with his report. The doctor declined to make a psychiatric evaluation of the petitioner. He testified that he would expect some physical findings if the pain which the petitioner urged that he experienced was in fact as severe as the petitioner represented.

It was then that a psychiatric evaluation was secured. This evaluation was conducted by Richard E. H. Duisberg, M.D., a psychiatrist who was later called as a witness. We deem this testimony to be so vital that we quote it in full in the footnote.[1]

1. "BY MR. JOHNSTON: (for the petitioner)
    "Q Will you please state your name, profession, and field of speciality?
    "A Richard E. H. Duisberg, M.D., psychiatrist.

"Q And you are authorized and licensed to practice medicine in the State of Arizona?
"A Yes.
"MR. JOHNSTON: Mr. Parsons, will you stipulate to the Doctor's qualifications?

"MR. PARSONS: (for the Fund) As a psychiatrist or neurologist, yes.

"Q BY MR. JOHNSTON: If I understand the report we have before us correctly, you saw Mr. Martinez initially back on or about November 21, 1968.

"A. Yes.

"Q And sir, can you tell us the reason or reasons it was that you came to see him at that time?

"A According to these notes, he came on his own hoping for support to his efforts to qualify for further examination for his back.

"Q Did you conduct an examination at that time?

"A An interview.

"Q I know we have the report, Doctor, but could you briefly tell us what you found?

"HEARING OFFICER: What was the date?

"THE WITNESS: November 21, 1968.

"MR. JOHNSTON: That report is in the file, Mr. Hearing Officer.

"HEARING OFFICER: All right.

"THE WITNESS: The interview consisted of his giving an account of his complaints, his version of the onset. He related the subsequent course, including the fact that his case had been closed and then reopened, or at least a reopening had been requested, and that a number of doctors examined him, but seemed to have found not much wrong with him. He had also consulted an attorney and his union. There was very little time for more detailed exploration of his background.

"I did pick up that he had been one in the middle of 16 brothers and sisters. A rather dreary, underprivileged childhood. He was in his second marriage, and tended to blame ill adjustments in the present one to inguinal problems.

"My impression, if you would like to— that was about the extent of the interview.

"Q All right, sir. Doctor, according to that report, I believe you reached an impression or a diagnosis.

"A Yes. I felt that he was of limited intellect, borderline. His personality was extremely inadequate, and that he was using what could be termed a conversion reaction in that he was focusing his difficulties on the back rather than on the personality inadequacies that he had.

"Q The back condition that came about at the time of his industrial accident?

"A Yes. He felt that he injured his back.

"Q With that in mind, several physicians have testified that his complaints were sincere and real and genuine to him with reference to his back. Would you agree with that as of the time you saw him, then?

"A Yes. I believe he believed his own version. I don't think he was consciously distorting or malingering.

"Q Doctor, you have then seen him again as requested in the second report which is dated July 13, 1970 is that correct?

"I believe, Mr. Hearing Officer, that report is contained in the file.

"THE WITNESS: That's correct.

"Q BY MR. JOHNSTON: Doctor, would you tell us, was his condition the same, or basically the same, or how would you describe his condition as compared then to the first time you saw him?

"A Essentially the same.

"Q Doctor, I notice in your report, and this is pretty much testified to. He goes out and does light work. He has no difficulty. It's when he does heavy physical labor he has problems. Is that what you understood?

"A Yes, it was his feeling.

"Q These are the complaints he has related to you that you have testified about.

"A Yes. My notes show that he is totally convinced that he can't last on any job for more than a few days, then he goes on to say, who would want a guy like that. He is convinced that he is worn out as perhaps a machine.

"Q And he relates all this back to the industrial accident?

"A He focuses on that.

"Q Doctor, was your opinion, then, this was a very real and significant problem to him, that he was not malingering, as you testified?

"A Yes, sir.

"Q As far as his condition is concerned?

"A To him that is real, but actually it's almost a delusional. It's a fixation that he has. It's like schizophrenics may have, that he is God or the Pope. This man has a fixation that he has a back injury and he is worn out.

"Q. Doctor, what hope or what help can we do or get for this man?

"A I think basically he is what we would call a pseudoneurotic, or undifferentiated neurotic. He has a very parasitic relation to work. He hasn't grown up.

"HEARING OFFICER: Did you say schizophrenic?

"THE WITNESS: Yes. Schizophrenia comes in a number of varieties, and many so-called ambulatory schizophrenics get

along very well in life and never see a psychiatrist and never had an acute psychotic break. Their reasons are very simple, and they have a very peculiar logic, and they have a way of blaming it on other things. For instance, if his marriage is maladjusted, it isn't wrong that he is doing it. It has to be somebody else doing it, which he related in the first interview. It has a lack of clarity, lack of objectivity, lack of realism. It's called undifferentiated schizophrenia.

'Q Do you have any recommendation for his care and treatment of his condition?

"A These people just limp through life. They can't quite keep up with the rest, and when they can't because of their inadequacies in personality, they will fold, and at times they will, as this man does, put all the blame on something other than his own inadequacies, and this man puts it on the strain.

"MR. JOHNSTON: No further questions.

EXAMINATION

"BY MR. PARSONS:

"Q I take it from what you said, Doctor, blaming the injury for his difficulty is a thing which is in his mind, rather than actually being a true cause of his problem, is that right?

"Yes.

"MR. PARSONS: I have no further questions.

EXAMINATION (Continued)

"BY MR. JOHNSTON:

"Q Doctor, what do you mean when you say a true cause?

"MR. PARSONS: I used the term. Don't blame the Doctor for that.

"Q BY MR. JOHNSTON: Leave out the word 'true'.

"Let me put it this way: In concerning the words true cause as placed to you by Mr. Parsons, what did you mean by that in interpreting the question? (Record read)

"MR. PARSONS: Doctor, you have used the term focusing, and you have used the word vain, and I take it from what you said in both of those reports, this man is focusing upon the injury we are concerned with here, and blaming it, but in fact there is no causal relationship between that injury and his present problems. Am I wrong in that?

"THE WITNESS: No, I would agree with that.

"MR. PARSONS: Have I expressed it properly, or would you like to express it in another way?

"THE WITNESS: That's the way I was saying it. The man has emotional problems. He can't cope with things, and

he finds something to blame it all on rather than being overwhelmed with his own sense of inadequacy.

"Q BY MR. JOHNSTON: Doctor, let me try not to play with words, and let me ask my question in another sense. If I understand you correctly, you feel that he genuinely, and the other doctors have said that he feels the pain that he told you about. To him this is real.

"A I don't know whether he feels the pain or has any pain. I think occasionally everybody has some back pain. He certainly is, shall I say pain oriented. It's a bit of an attention thing. For instance, to give an analogy, if you were to buy a car, a brand you never had before, let's say that you always drove Fords, now you buy yourself a Buick, you usually notice more Buicks on the road than you ever saw before. You are sort of now Buick conscious. This man is back conscious. He has to be, because it relieves him of the anxiety, the overwhelming fear of his own personality and his ability to keep up with it in life. Now in this, he is convinced—he must convince himself to save himself from the collapsity of complete disintergration of his personality. There is no doubt in my mind that he is sincere in this belief. He has to be. If he were—he doesn't impress me as a malingerer. He believes he has a bad back, a worn-out back. All of these ideas are there. They are fixed ideas, and they are essentially ideas, but they are not due to the injury, but of the need to have an injury to explain his inadequacies.

"Q He is using the injury, is what you are saying.

"A Yes, and he uses it unconsciously. It is a defense mechanism with disregard.

"Q And this condition that you have described, I take it preexisted his industrial accident.

"A His personality?

"Q His personality.

"A Yes.

"Q And prior to the industrial accident, there is no question that he was able and did in fact function as a provider for his family insofar as performing his labor. I'm not talking about inadequacies for home life.

"A If that is the indication, I don't know how mediocre or how bad it could have been. It's not outstanding. I doubt that.

"Q And would you agree, Doctor, that if he had not had this industrial accident of the type of injury that he had, he

The referee in reporting to the Commission stated in part as follows:

### FINDINGS

"(1) That applicant does not have any new, additional or previously undiscovered disability attributable to the injury by accident arising out of and in the course and scope of applicant's employment with the above-named defendant employer on January 23, 1968.

### RECOMMENDATION

"It is recommended that Decision Upon Hearing and Findings and Award Denying Reopening of Claim be entered in accordance with the foregoing finding with a Thirty (30) Day Clause.

### BASIS

"A thorough review of the record and the evidence received at the three hearings does not substantiate applicant's claim that he has sustained new, additional or previously undiscovered disability. Orthopedic evaluation fails to disclose objective findings of a physical disability. Psychiatric evaluation indicates that applicant feels that he has pain. Although Dr. Duisberg feels applicant probably is sincere in his complaints he fails to relate any condition of this nature to the industrial injury, and that this preceded the injury."

The Commission approved the report of the referee and entered its award denying the requested reopening following which the matter was brought to this Court by a timely writ of certiorari.

There are a number of Arizona cases wherein the right to awards of compensation for conditions similar to those described by Dr. Duisberg and suggested by Drs. Hartman and Fisler have been sustained. We cite a few of these cases and therein can be found additional citations. Tatman v. Provincial Homes, 94 Ariz. 165, 382 P.2d 573 (1963); Smith v. Martin Marietta Corporation, 2 Ariz.App. 111, 406 P.2d 746 (1965); Selvidge v. American Airlines, Inc., 4 Ariz.App. 104, 417 P.2d 738 (1966); Lyman v. Industrial Commission of Arizona, 11 Ariz.App. 31, 461 P.2d 510 (1969) and Brock v. Industrial Commission of Arizona, 15 Ariz.App. 95, 486 P.2d 207 (1971)

There is no medical evidence which is contrary to Dr. Duisberg's opinion. Dr. Duisberg's opinion falls squarely within the cases above cited. The Commission is not at liberty to substitute its judgment for the clear medical opinion of Dr. Duisberg.

The award is set aside.

CASE and DONOFRIO, JJ., concur.

---

would not today be complaining of the pain that he complains of; he might be—his problems might be manifested another way, but his belief of pain, and sincerity of pain, and his back being worn out isn't existent today.

"A These people reach a grading point. Life being too difficult to cope with, and a trivial thing will become a peg so that we can say these are accidents looking to happen. You see, he needed —it was getting too hard to keep up the pace.

"Q *And this industrial accident was the peg.*

"A *This is the one that did it.* (Emphasis added.)

"MR. JOHNSTON: No further questions.

"MR. PARSONS: I have nothing further.

"MR. JOHNSTON: Thank you very much, Doctor.

"HEARING OFFICER: There being nothing further to come before the hearing, the Hearing will be closed subject to the continuing jurisdiction of the Commission to take further action."